## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Case No. 1:25-mj-00276** |
| | : | |
| **BRIAN J. COLE, JR.,** | : | |
| | : | |
| Defendant. | : | |

### GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION

    The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its oral motion for defendant Brian J. Cole, Jr. to be detained pending trial.  The defendant is charged by complaint with transporting and planting two improvised explosive devices (IEDs)—so-called "pipe bombs"—in the immediate vicinity of the headquarters of the Republican National Committee (RNC) and the Democratic National Committee (DNC) on January 5, 2021, in violation of 18 U.S.C. §§ 844(d) and 844(i).   Following his December 4, 2025 arrest, the defendant waived his *Miranda* rights and gave a detailed confession to the charged offenses.

    The government seeks pretrial detention under 18 U.S.C. § 3142(f)(1)(A).   Section 844(i) is an offense listed as a federal crime of terrorism in § 2332b(g)(5)(B) carrying a maximum term of imprisonment of 10 years or more.   Upon a finding of probable cause that the defendant violated § 844(i), the federal bail statute creates a rebuttable presumption that no conditions will reasonably assure the community's safety if the defendant is released pending trial.   The defendant cannot rebut this presumption considering the extreme and profoundly serious nature of his crimes, the overwhelming evidence of his guilt, the years he has spent deceiving those around him to avoid accountability, and the intolerable risk that he will again resort to violence to express his frustration with the world around him.   The Court should detain the defendant pending trial.

## BACKGROUND

On December 4, 2025, the defendant was arrested, and a complaint was unsealed charging him with violations of 18 U.S.C. §§ 844(d) and 844(i).   *See* ECF No. 1.   The defendant made his initial appearance on December 5, 2025, and he was held pending a detention hearing.   The detention hearing is scheduled for December 30, 2025.

### *January 5, 2021*

The charges against the defendant arise from his manufacturing, transporting, and planting of two pipe bombs in downtown Washington, D.C. on January 5, 2021.   The defendant planted the first bomb at approximately 7:54 p.m. in the immediate vicinity of the DNC headquarters located at 430 South Capitol Street, Southeast.   He planted the second bomb at approximately 8:16 p.m. in the immediate vicinity of the RNC headquarters at 310 First Street, Southeast.   The two locations are approximately 0.2 miles apart.

Earlier that evening, at approximately 7:10 p.m., the defendant, driving his 2017 Nissan Sentra, took the South Capitol Street exit from Interstate 395 South, passing a license plate reader that recorded his vehicle and tag information.   Approximately 24 minutes later, at about 7:34 p.m., surveillance video first captured the defendant walking approximately one-half mile from the South Capitol Street exit, near the intersection of First Street and North Carolina Avenue, Southeast.   As captured on video, and shown below, the defendant was holding a backpack in his hand by the top strap and wearing dark pants, a grey hooded sweatshirt, dark gloves, Nike Air Max Speed Turf shoes, and a facemask and hood that obscured his face.



The footage also showed the defendant—who investigators from the Federal Bureau of Investigation (FBI), based on a height analysis of the video, estimated to stand 5 feet 7 inches tall with an error rate of +/- 1.1 inches—putting on a pair of eyeglasses and scanning the area, as depicted below.  The defendant is approximately 5 feet 6 inches tall and wears corrective eyeglasses.



At approximately 7:39:27 p.m., about five minutes after the defendant was first captured on surveillance video, his cellphone interacted with two cell towers consistent with him being in the area of the intersection of D Street and South Capitol Street, Southeast.[1]   Surveillance video showed that at approximately 7:39:32 p.m., the defendant walked westbound on D Street, Southeast then turned southbound on South Capitol Street, Southeast.   About five minutes later, at approximately 7:44:36 p.m., the defendant's cellphone interacted with a cell tower consistent with him being in the area of Ivy Street, Southeast, a one-block road bounded by Canal Street, Southeast and New Jersey Avenue, Southeast.   Surveillance video showed that at approximately 7:44:36 p.m., the defendant walked east on Ivy Street, Southeast.

About fifteen minutes later, at approximately 7:59:36 p.m., the defendant's cellphone interacted with a cell tower consistent with him being in the area of the intersection of New Jersey Avenue, Southeast and E Street, Southeast.   Surveillance video showed that at approximately 7:59:38 p.m., the defendant walked southbound on New Jersey Avenue, Southeast then turned eastbound on E Street, Southeast.   This intersection is approximately 0.1 miles from the immediate vicinity of the DNC headquarters, where the defendant placed the first pipe bomb, shown below, at approximately 7:54 p.m.

---

[1]  Records obtained from the relevant cellular provider listed the relevant sector of one of these towers as facing north as of February 2021.   However, the provider updated its records in April 2021 to reflect that the tower sector in fact faced east, an orientation that would provide coverage to the intersection of D Street and South Capitol Street, Southeast.   The eastward orientation was consistent with FBI drive tests conducted in January and February 2021.   Based on the information available, the FBI assesses that the provider record listing the relevant tower sector as facing north in February 2021 was an error that was corrected in April 2021, and that on January 5, 2021, that tower sector faced east.



About twenty minutes later, at approximately 8:14:36 p.m., the defendant's cellphone interacted with a cell tower consistent with him being in the area of Rumsey Court, Southeast, a single-block alley within the area bounded by 1st Street and 2nd Street, Southeast and C Street and D Street, Southeast.    Surveillance video showed that at approximately 8:14:15 p.m., the defendant exited Rumsey Court and walked westbound through an alley between the Capitol Hill Club and the RNC then walked northbound onto First Street, Southeast.    Surveillance video showed that the defendant then returned to Rumsey Court.    The video last captured the defendant walking eastbound on Rumsey Court at 8:18 p.m.    Based on the video, the defendant appears to have placed the second bomb, shown below, in the vicinity of the RNC at approximately 8:16 p.m.



Finally, at approximately 8:23:59 p.m. and 8:24:06 p.m., the defendant's cellphone interacted with a cell tower consistent with him being in the area east of Rumsey Court, where he was last captured on video about six minutes earlier. The graphic below illustrates the defendant's interactions with nearby cell towers in relation to the RNC and DNC headquarters where he placed the bombs.



*The Pipe Bombs and the Defendant's Purchasing History*

The pipe bombs that the defendant planted near the RNC and DNC did not detonate as intended and were not discovered until approximately 1:00 p.m. on January 6, 2021.   The Hazardous Devices Section of the United States Capitol Police (USCP) responded and performed a render safe procedure on both devices.   Subsequently, the FBI assessed that the two devices were both IEDs which contained a main explosive charge, a fuzing system, and a container.   The FBI also assessed that the IEDs used a hard metal container (metal pipe nipples and end caps), which showed that weapon characteristics were present.   The FBI recovered the components of

the disrupted devices.    These components were processed as evidence and submitted to the FBI Laboratory for analysis.    The FBI Laboratory issued a report regarding the two devices, opining that the submitted items consisted of two disrupted destructive devices and that the use of a hard metal container showed that weapon characteristics were present.    The FBI explosives examiner assessed that the pipe bombs were constructed using all the components necessary to explode and that they were viable explosive devices.

Both pipe bombs were manufactured using a collection of component parts and a main explosive charge.    The component parts included a 1-inch by 8-inch pipe nipple, end caps affixed to the pipe, 14-gauge electrical wire in red and black, alligator clips to connect the wires, a nine-volt (9v) battery, a nine-volt (9v) battery connector, a white kitchen timer, paper clips, steel wool, and homemade black powder.    The general construction of the pipe bomb components is illustrated below.



The FBI obtained records for the defendant's checking account and three of his credit cards for the time period January 2018 to January 2021.   Records for three additional credit cards were obtained for the period of January 2018 to November 2025.   The FBI reviewed the transaction history for all of these accounts.

Between 2018 and 2020, the defendant purchased numerous components that he used to manufacture the pipe bombs placed at the RNC and DNC.   The defendant purchased these components primarily from physical retail locations in northern Virginia, as listed in the table below.

| Component | Picture | Quantity | Purchase Date | Store |
|---|---|---|---|---|
| 9V Battery Connector | | 5 | 11/12/2019<br>12/28/2019 | Micro Center |
| Timer | | 2 | 6/3/2020 | Walmart |
| 1"x8" Pipe Nipple | | 6 | 6/1/2020<br>6/8/2020<br>11/16/2020 | Home Depot |
| Black Iron End Cap | | 12 | 10/22/2019<br>6/20/2020<br>7/8/2020<br>11/16/2020 | Home Depot |
| Galvanized End Cap | | 2 | 3/10/2020 | Home Depot |
| 14 Gauge Red Wire | | 350 ft | 5/23/2019<br>10/22/2019<br>9/27/2020<br>10/7/2020 | Home Depot |
| 14 Gauge Black Wire | | 150 ft | 9/27/2020<br>10/7/2020 | Home Depot |
| 14 Gauge Red Wire | | 100 ft | 11/24/2020 | Lowes |
| 14 Gauge Black Wire | | 100 ft | 11/24/2020 | Lowes |
| Steel Wool | | 1 | 12/4/2020 | Home Depot |
| Sulfur | | 1 lb | 1/14/2018 | Amazon |

In addition to purchasing each type of component used to make the pipe bombs, the defendant purchased equipment for manufacturing of pipe bombs.    Such items included:

- Safety glasses on or about July 8, 2020;

- A wire stripping tool on or about November 14, 2020;

- Wire nuts, which are used to join wires together, on or about November 14, 2020;

- Sandpaper on or about November 21, 2020;

10

- A machinist's file, a tool for shaping and smoothing metal parts, on or about November 21, 2020; and

- Protective gloves and disinfecting wipes on or about November 24, 2020.

After planting the pipe bombs on January 5, 2021, the defendant continued to purchase bombmaking components, as illustrated below.    The last identified purchase occurred on August 13, 2022.

| Component | Picture | Quantity | Purchase Date | Store |
|---|---|---|---|---|
| Timer |  | 1 | 1/21/2021 | Walmart |
| 1"x8" Pipe Nipple |  | 8 | 1/22/2021<br>3/20/2021<br>10/6/2021<br>8/10/2022 | Home Depot |
| Black Iron End Cap |  | 11 | 4/4/2021<br>6/1/2021<br>6/8/2021<br>6/26/2021<br>10/11/2021<br>8/13/2022 | Home Depot |
| Galvanized End Cap |  | 8 | 3/20/2021<br>3/21/2021<br>8/13/2022 | Home Depot |
| 14 Gauge Red Wire |  | 50 ft | 6/1/2021 | Home Depot |
| 14 Gauge Black Wire |  | 50 ft | 6/1/2021 | Home Depot |
| Steel Wool |  | 1 | 1/22/2021 | Home Depot |
| Alligator Clips |  | 2 | 1/23/2021 | Home Depot |

### *The Defendant's Arrest and Confession*

On December 4, 2025, law enforcement executed an arrest warrant for the defendant and took him into custody.    Search warrants were executed on the defendant's person, his home in Woodbridge, Virginia, his Nissan Sentra, and his workplace in Fairfax, Virginia.

A Samsung cellular device was seized from the defendant's person at the time of his arrest. A forensic review of the device's contents showed that between December 2020 and December 2025, the device recorded 943 events identified as a "factory reset" or "wipe," including a "wipe" event approximately three hours before the defendant's arrest on December 4, 2025.[2]

Inside the defendant's home, law enforcement recovered, among other evidence, (1) a Home Depot shopping bag containing three black iron end caps, one galvanized end cap, two 1-inch by 8-inch pipe nipples, and a Home Depot receipt dated November 16, 2020, for two 1-inch by 8-inch pipe nipples, three black iron end caps, and gloves located inside a closet accessible only through the defendant's bathroom; (2) a Lowes shopping bag containing two galvanized end caps located inside the same closet; and (3) 14-gauge red wire and wire strippers located inside the garage.    Inside the defendant's vehicle, law enforcement recovered, among other evidence, (1) a Home Depot receipt dated August 10, 2022, for hand sanitizer, two 1-inch by 8-inch pipe nipples, and work gloves; (2) a Home Depot shopping bag containing two 1-inch by 8-inch pipe nipples; (3) a Home Depot shopping bag containing two black iron end caps and two galvanized end caps; and (4) a nine-volt (9v) battery.

---

[2] The first "factory reset" or "wipe" event took place on December 15, 2020.    The next such event did not occur until July 15, 2022.    From that date, the "factory reset" or "wipe" events occurred at least once a week.    On some days, the device appears to have been wiped multiple times in the same day.

Following his arrest, the defendant was transported from Woodbridge, Virginia to the FBI's Washington Field Office, where he executed a written waiver of his *Miranda* rights and was interviewed by investigators for multiple hours.    During the interview, which was video-recorded, the defendant initially denied manufacturing, transporting, and planting the pipe bombs.    When asked about his whereabouts on January 5, 2021, the defendant stated that he drove his Nissan Sentra to Washington, D.C. by himself that evening to attend a protest concerning the outcome of the 2020 election.    The defendant explained: "I didn't agree with what people were doing, like just telling half the country that they – that their – that they just need to ignore it. I didn't think that was a good idea, so I went to the protest."    The defendant "has never really been an openly political person" and does not discuss politics often with his family to avoid conflict. According to the defendant, "no one knows" his political views, including his family.    The defendant stated that he does not align politically with his family members and did not tell them that he "was going to a protest in support of [then President] Trump."

Later in the interview, the defendant explained that after the 2020 election, "when it first seemed like something was wrong" and "stuff started happening," he began following the issue closely on YouTube and Reddit and felt "bewildered."    In the defendant's view, if people "feel that, you know, something as important as voting in the federal election is being tampered with, is being, you know, being – you know, relegated null and void, then, like, someone needs to speak up, right?    Someone up top.    You know, just to, just to at the very least calm things down." The defendant felt that "the people up top," including "people on both sides, public figures," should not "ignore[e] people's grievances" or call them "conspiracy theorists," "bad people," "Nazis," or

"fascists."     Instead, "if people feel that their votes are like just being thrown away, then . . . at the very least someone should address it."

As the interview continued, the defendant maintained that he did not plant the pipe bombs. However, when the defendant was shown a picture of a Nike Air Max Speed Turf shoe, he admitted that he "used to have a pair" and stated that he "threw them away" because "they were old and they were coming apart."     After approximately two hours, during which the defendant maintained that he had not placed the bombs, one of the interviewing agents asked the defendant if he wanted to end the interview.     The defendant responded that "everything is just blank" and "a little too much to process."     The interviewing agents then suggested that the defendant look at video footage from the night of January 5, 2021.     When the defendant was shown a still image of himself on surveillance video close in time to the planting of the bombs, he stated that he did not recognize the person and had not previously seen the video.     The interviewing agents reminded the defendant that lying to them was an additional criminal offense and asked the defendant again whether he was the individual on the surveillance video.     This time, the defendant paused for approximately fifteen seconds, placed his head face down on the table, and answered, "yes."

After the defendant's admission, the interviewing agents explained to him that they could either continue to discuss his actions on January 5, 2021, or they could stop the interview and transport the defendant to court for his initial appearance.     The agents explained what an initial appearance is and that if the defendant continued with the interview, he would appear in court the following day.     The defendant asked for time to process things, and the agents stepped out of the interview room for approximately twenty minutes.     When they returned, the defendant expressed

his interest in continuing the interview and executed a written waiver to delay his presentment in court to the next day.

Over the next approximately one and one-half hours, the defendant walked the interviewing agents in detail through his construction, transportation, and planting of the pipe bombs. The defendant explained that he made the black powder in the devices using charcoal, Lilly Miller sulfur dust, and potassium nitrate that he purchased from Lowes. The defendant mixed these ingredients in a Pyrex bowel and used a spoon or measuring cup to pour the black powder into the devices. According to the defendant, he learned to make the black powder from a video game that listed the ingredients, and he also viewed various science-related videos on YouTube to assist him in creating the devices. Regarding the construction of the devices, the defendant explained that he used a hand drill and bit to drill the end caps on the devices, used pliers to crimp the alligator clips, and used kitchen timers rather than alarm clock timers because the kitchen timers were easier to use. When asked where he kept the bombmaking materials, the defendant explained that he hid them in a closet inside his home so they would not be found by a family member. The defendant stated that he assembled the devices in the hours before he drove to Washington, D.C. on January 5, 2021, and that he cleaned the devices with disinfectant wipes. Eventually, the defendant admitted that he did not go to Washington, D.C. to attend a protest but in fact traveled there to plant the devices.

The defendant stated that he transported the devices to Washington, D.C. on January 5, 2021, inside a shoe box in the back seat of his Nissan Sentra. He wore a mask and hood that evening to avoid identification, and he wore gloves to avoid leaving fingerprints. When the defendant arrived in the city, he parked his car on D Street, Southeast, between 2nd Street and 3rd

Street and Folger and Providence Parks.    The defendant placed one of the devices in his backpack, exited his car, and walked toward the DNC.    He set the timer on the first device to the maximum duration (60 minutes) and planted the device near the DNC.    The defendant then returned to his car, retrieved the second device and placed it in his backpack, and walked to the RNC, where he set the timer for 60 minutes and planted the device.    The defendant explained that he had used Google Maps to look up these locations in advance.    After planting the devices, the defendant returned to his car, left the city, picked up food from a restaurant in Virginia, and returned home.

According to the defendant, he was not really thinking about how people would react when the bombs detonated, although he hoped there would be news about it.    The defendant stated that he had not tested the devices before planting them.    He claimed that when he learned that the devices did not detonate, he was "pretty relieved," and asserted that he placed the devices at night because he did not want to kill people.    After seeing himself on the news, the defendant stated that he discarded all the bombmaking materials he had at a nearby dump.    The defendant stated that he did not tell anyone about the pipe bombs before planting them or in the years since. Although the defendant denied building additional explosive devices, he admitted that sometime after he built the pipe bombs used in this case, he purchased beaker sets and conducted another science experiment to create potassium chlorate, which he claimed was unrelated to bombmaking.

When the interviewing agents returned to the defendant's motive, he explained that "something just snapped" after "watching everything, just everything getting worse."    The defendant wanted to do something "to the parties" because "they were in charge."    When asked why he placed the devices at the RNC and DNC, the defendant responded, "I really don't like

either party at this point."    The defendant also explained that the idea to use pipe bombs came from his interest in history, specifically the Troubles in Ireland.    The defendant denied that his actions were directed toward Congress or related to the proceedings scheduled to take place on January 6.

<u>**ARGUMENT**</u>

The defendant poses an intolerable risk of danger to the community if released, and he should be detained pending trial under 18 U.S.C. § 3142(f)(1)(A).    The defendant is charged by complaint with transporting explosives across state lines intending to use them to intimidate and damage or destroy property in violation of 18 U.S.C. § 844(d), and with maliciously attempting to use those explosives to damage or destroy property in violation of 18 U.S.C. § 844(i).    The latter offense is listed as a federal crime of terrorism in § 2332b(g)(5)(B) and carries a maximum term of imprisonment of 20 years, thereby requiring a detention hearing and judicial determination as to whether any condition or combination of conditions would reasonably assure the community's safety if the defendant were released pending trial.    18 U.S.C. § 3142(f)(1)(A).    Upon a finding of probable cause that the defendant violated § 844(i), the federal bail statute creates a rebuttable presumption that no such conditions exist.    *Id.* § 3142(e)(3)(C).

The Court must weigh four factors in determining whether the defendant has rebutted the presumption of detention: (1) the nature and circumstances of the offenses charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release.    *See* 18 U.S.C. § 3142(g).    In making this determination, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the

[detention] hearing." *Id.* § 3142(f). Specifically, the presentation of hearsay evidence is permitted, and the government may proceed by proffer. *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996).

The defendant cannot rebut the statutory presumption of detention considering the extreme and profoundly serious nature of his crimes, the overwhelming evidence of his guilt, the years he has spent deceiving those around him to avoid accountability, and the intolerable risk that he will again resort to violence to express his frustration with the world around him. The facts and circumstances in this case compel the conclusion that there is no condition or combination of conditions that would reasonably assure the safety of the community if the defendant were released pending trial.

## A. <u>Nature and Circumstances of the Charged Offenses</u>

The nature and circumstances of the defendant's crimes weigh heavily in favor of pretrial detention. The defendant is charged with transporting two explosive devices into Washington, D.C. and planting them at the headquarters of the two major political parties in the United States. By his own admission, the defendant committed these chilling acts because he was unhappy with the response of political leaders on both sides of the political aisle to questions raised about the results of the 2020 election, and "something just snapped."

While the defendant may have reached a psychological breaking point, his crimes were anything but impulsive. Indeed, the defendant's pipe bombs—and the fear and terror they instilled in the general public—were the product of weeks of premeditation and planning. The defendant purchased the components that he used to construct the bombs over a series of months, including before and after the 2020 election. The defendant acquired the knowledge necessary

18

to assemble the devices, according to him, by watching YouTube science videos and playing video games.    Whatever the precise contours of the defendant's research and preparation, it was sufficiently extensive for him to assemble the two pipe bombs in the hours leading up to his travel to Washington, D.C. to plant them on January 5, 2021.    And it was sophisticated enough for him to construct viable explosive devices using all the components necessary to cause an explosion. The calculated nature of the defendant's criminal conduct over an extended period should feature prominently in the Court's detention determination.

Perhaps more than anything else, the defendant's choice of targets demonstrates the extreme and deeply dangerous nature of his conduct.    Although the defendant acquired the bombmaking components in the months leading up to January 5, 2021, he chose to plant them at the headquarters of the nation's two major political parties in downtown Washington, D.C., on the eve of the January 6 certification of the electoral college vote.    In his own words, the defendant did so because he did not "like either party," but "they were in charge" and thus were, in the defendant's mind, an appropriate target for extreme acts of violence.    The defendant's choice of targets risked the lives not only of innocent pedestrians and office workers but also of law enforcement, first responders, and national political leaders who were inside of the respective party headquarters or drove by them on January 6, 2021, including the Vice President-elect and Speaker of the House.[3]    In this sense, the defendant's invocation of the Troubles in Northern Ireland is telling; bombings were used frequently throughout that period to kill officials and civilians for

---

[3] *See* Staff of H. Subcomm. on Oversight & H. Subcomm. on Admin. State, Reg. Reform, and Antitrust, 119th Cong., *Four Years Later: Examining the State of the Investigation into the RNC and DNC Pipe Bombs* (Jan. 2, 2025) (Interim Report), at 19, 25.

political purposes.[4]   The Court should consider the gravity of the defendant's targets in assessing the nature of the charged offenses.

Ultimately, it was luck, not lack of effort, that the defendant failed to detonate one or both of his devices and that no one was killed or maimed due to his actions.   Indeed, the defendant admitted that he set both devices to detonate 60 minutes after he placed them.   His failure to accomplish his objectives does not mitigate the profoundly dangerous nature of his crimes. Appropriately, the defendant now faces criminal charges that carry significant penalties, including a five-year mandatory minimum sentence for violating 18 U.S.C. §§ 844(i).   The defendant's actions, and the significant potential sentence he now faces, demonstrate the need for pretrial detention in this case.

### B.  <u>Weight of the Evidence Against the Defendant</u>

The overwhelming weight of the evidence in this case favors pretrial detention.   The video, location, and purchase history evidence that led to the defendant's arrest and charging is powerful proof of guilt in itself.   That evidence is now corroborated not only by the recovery of consistent bombmaking components from the defendant's home and vehicle, but by the defendant's hours-long videotaped confession, in which he explained his criminal conduct and intent in detail to investigators.   The weight of the evidence against the defendant, and the attendant likelihood of his conviction for serious offenses, support pretrial detention.

---

[4] *See, e.g.*, *The Troubles: Northern Ireland History*, Encyc. Britannica, (last visited Dec. 23, 2025), https://www.britannica.com/event/The-Troubles-Northern-Ireland-history.

C. **The Defendant's History and Characteristics**

Although the defendant has not had prior contact with the criminal justice system, his personal history and circumstances demonstrate that conditions less restrictive than detention will not reasonably assure the community's safety while this case proceeds.    After placing two explosives at significant targets on January 5, 2021, the defendant spent the immediate aftermath, and the nearly five years since, engaged in a comprehensive effort to evade detection and apprehension by law enforcement.    By his own admission, the defendant, having disguised himself during the commission of the charged offenses to avoid identification, discarded direct evidence of his crimes after they were publicized in the media.    Disturbingly, however, the defendant continued to purchase bombmaking components through mid-2022 and used those materials to create, or attempt to create, potassium chlorate.    While the defendant claimed in his interview that this was an innocent science experiment, potassium chlorate is an oxidizing agent commonly used in explosives.[5]

Critically for the Court's consideration, the defendant engaged in all the relevant conduct— developing his motive, purchasing the bombmaking materials, constructing the devices, traveling to D.C. to plant them, and evading apprehension for years—while living under the roof of his family's home.    Given the scrutiny of a years-long national investigation into his actions, the defendant had an understandable incentive to keep those closest to him in the dark.    Indeed, the defendant apparently wiped his personal cellphone nearly one thousand times during this period. The defendant now faces the scrutiny of a federal criminal prosecution.    Under these

---

[5] *See, e.g.*, Masahiro Tagawa et al., *Effects of composition on the explosive properties of potassium chlorate and oils*, 10 FORENSIC SCIS. RSCH. 1 (2025).

circumstances, there is simply no reason to expect that the defendant, if released pending trial, will conduct himself differently than he has for the past five years.   Rather, there are substantial grounds to conclude that the defendant would continue to present an intolerable danger to the community.

**D.  <u>Danger to the Community</u>**

The defendant has confessed to planting explosive devices outside the headquarters of the nation's two major political parties in downtown Washington, D.C.   He has confessed to constructing the pipe bombs, to filling them with explosive powder, and to setting their timers to detonate.   The evidence gathered in law enforcement's investigation in this case corroborates the defendant's confession.   And it establishes that these explosive devices were viable weapons.

Put simply, the defendant poses an uncommonly serious danger to the community if released pending trial.   For nearly five years, the defendant has evaded law enforcement and avoided accountability for actions that endangered lives and created a widespread sense of fear and terror.   The community should not be subjected to the risk that the defendant, now identified and facing a public prosecution, will again resort to violence as his chosen means to express his dissatisfaction with the world around him.   There is simply no combination of conditions that will reasonably assure the community's safety if the defendant is released, and he should be detained pending trial in this case.

## **CONCLUSION**

The government respectfully requests that the Court grant its motion and detain the defendant pending trial.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:        */s/ Charles R. Jones*
CHARLES R. JONES
D.C. Attorney No. 1035541
Assistant United States Attorney
National Security Section
601 D Street N.W.
Washington, D.C. 20530
(202) 252-6976
Charles.Jones3@usdoj.gov