UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

UNITED STATES OF AMERICA

v.

BRIAN J. COLE, JR.,

Defendant.

Case No. 1:25-mj-276

---

### MEMORANDUM OPINION AND ORDER

Defendant Brian J. Cole, Jr. stands charged with two criminal offenses under federal law. Both charges stem from an accusation that Mr. Cole built, transported, and tried to detonate two improvised explosive devices ("IEDs")—so-called "pipe bombs"—near the headquarters of the Democratic National Committee ("DNC") and the Republican National Committee ("RNC"), in the heart of Washington, D.C., on the evening of January 5, 2021.

The case is before the Court on the government's motion for pretrial detention. On the specific circumstances presented here, the Court's analysis begins with a rebuttable presumption that Mr. Cole's preventive detention is required under the governing statute. Even assuming Mr. Cole successfully rebuts that starting presumption, the Court concludes that the government carried its ultimate burden to demonstrate that there are no conditions of release the Court could impose to reasonably assure the safety of the community. So the Court **GRANTS** the government's motion and orders that Mr. Cole shall remain detained while this case proceeds.

### BACKGROUND

The underlying circumstances here are widely known, at least in broad strokes. On January 6, 2021, law enforcement discovered two IEDs near the DNC and RNC headquarters in Washington, D.C., both in close proximity to the U.S. Capitol. January 6, 2021, of course, was the

date Congress convened to certify the results of the 2020 election, and U.S. lawmakers were assembled nearby to carry out that constitutional duty. Neither device detonated, and the U.S. Capitol Police were able to carry out a "render safe procedure" on the IEDs without incident. But all the same, the surrounding events triggered serious alarm, particularly given the timing and broader context within which they occurred. And so, the government commenced what would become a lengthy investigation to identify and hold accountable the suspected perpetrator(s).

Fast forward nearly five years. On December 3, 2025, law enforcement criminally charged Mr. Cole with planting the IEDs. Specifically, the criminal complaint against him encompasses two offenses: (1) transportation of an explosive device in interstate commerce with the intent to kill, injure, or intimidate any individual or unlawfully to damage or destroy any building, vehicle, or other real or personal property, under 18 U.S.C. § 844(d); and (2) malicious destruction or attempted malicious destruction by means of fire and explosive materials, under 18 U.S.C. § 844(i). (*See* ECF No. 1, Compl.) According to the government's proffer in support of detention, its investigation pointed to Mr. Cole for at least the following reasons:

- The government assessed that the IEDs were placed at approximately 7:54 and 8:16 PM at the DNC and RNC headquarters, respectively. The government's analysis of Mr. Cole's cellphone records showed that his phone interacted with five different cell towers in the vicinity of those two locations during that same window on January 5, 2021. (ECF No. 17 at 4–7.)

- A license plate reader recorded Mr. Cole's vehicle and tag in the area around 7:10 PM that evening, exiting I-395 South at South Capitol Street. (*Id.* at 2.)

- The government reviewed Mr. Cole's financial records, including credit card and bank account statements, which showed that he purchased nearly all the distinct components used to construct the two IEDs from retail locations in Northern Virginia on various dates throughout 2019 and 2020. The government's detention memorandum catalogues in detail these component parts and their purchase dates in chart format. (*See id.* at 10.)[1]

---

[1] As discussed later, the government's proffer also indicates that Mr. Cole purchased more of these same component parts for many months after the events in question, up to and including in August 2022.

On December 4, 2025, law enforcement arrested Mr. Cole at his home in Woodbridge, Virginia. In conjunction with the arrest, law enforcement executed various search warrants, including on Mr. Cole's residence and his vehicle. Inside the residence, in a closet that was accessible only through Mr. Cole's bedroom, law enforcement recovered several of the same parts that had been used in the explosive devices recovered outside the DNC and RNC headquarters in January 2021, including metal pipes, iron and galvanized end caps, wire, and more. And inside Mr. Cole's vehicle, law enforcement recovered more of these same parts, including metal pipes, iron and galvanized end caps, and a nine-volt (9v) battery. Law enforcement also seized a cellular device from Mr. Cole's person during the arrest; the government's forensic review of the device revealed that it was "wiped"—*i.e.*, subject to a "factory reset"—943 times between December 2020 and December 2025, occurring at least weekly since July 2022.

Following his arrest, Mr. Cole was transported to the FBI's Washington Field Office, where he reportedly executed a written waiver of his *Miranda* rights and agreed to be interviewed by law enforcement. According to the government's characterization of the video-recorded interview—a characterization the defense did not contest as part of the detention proceedings, whether in its written submissions or during the detention hearing—the following transpired.

Mr. Cole initially denied any involvement with the underlying offenses. He acknowledged that he drove into D.C. on the evening of January 5, 2021, but claimed he was simply attending a protest "in support of [then-President] Trump" about the outcome of the 2020 election. Reportedly, after several hours, though, Mr. Cole admitted he was the suspect depicted in the surveillance videos. At that point, the government represents, the interviewing agents advised Mr. Cole that they could continue the interview or stop it. Mr. Cole asked for time to process things, and the

agents stepped out for about twenty minutes. When they returned, Mr. Cole reportedly agreed to continue the interview and executed a written waiver to delay his presentment in court.

Mr. Cole, according to the government's proffer, then walked the interviewing agents through his construction, transportation, and placement of the explosive devices on the evening of January 5, 2021. He described how he manufactured the devices, including the black powder inside. He told the agents he assembled the devices in the hours before he drove them into Washington, D.C. from Virginia that same evening. Mr. Cole explained that after parking his vehicle near the relevant area on Capitol Hill, he put one of the devices in his backpack and walked toward the DNC headquarters, where he set the timer to its maximum duration (60 minutes) and placed it under a public bench near the building. At that point, Mr. Cole stated that he returned to his car, placed the second device in his backpack, and walked to the RNC headquarters where he likewise set that timer for 60 minutes and left the device next to a trash bin outside the building. (Mr. Cole explained he had used Google Maps to look up these locations in advance.) Afterward, Mr. Cole returned to his vehicle, left the city, picked up food at a restaurant, and went home.

Mr. Cole explained to the interviewing agents—again, at least according to the government's characterization of the post-arrest interview—that he was not really thinking about how people would react when the bombs detonated, but he hoped there would be news about it. He said that when he learned the devices did not detonate, he was "pretty relieved," reportedly stating that he planted the devices at night because he did not want to kill people. When the agents asked about Mr. Cole's motive, he said that "something just snapped" after "watching everything, just everything getting worse." He described wanting to do something "to the parties" because "they were in charge," and stated that "[he did not] like either party." During the interview, Mr.

4

Cole apparently denied that his actions were directed at Congress or the election certification proceedings scheduled to take place on January 6, 2021.

On December 5, 2025, Mr. Cole had his initial court appearance. During that hearing, the government moved for his pretrial detention, and the presiding judge scheduled a hearing on the matter for December 15—an agreed date between the parties. About a week later, the parties filed a consent motion to continue the detention hearing by about two weeks to December 30, which the court granted. (ECF Nos. 9, 11.) Both sides filed briefs in advance. (ECF Nos. 17, 23.) The undersigned presided over the detention hearing and took the matter under advisement in lieu of ruling from the bench. This written ruling now follows.[2]

## DISCUSSION

Under the Bail Reform Act of 1984, 18 U.S.C. §§ 3141, *et seq.*, if a judicial officer finds after conducting a hearing that "no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of any other person and the community, such judicial officer shall order the detention of the [defendant] before trial." 18 U.S.C. § 3142(e)(1). For purposes of that assessment, the Court's default must generally tilt toward release, as "detention prior to trial … is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 742 (1987); *United States v. Munchel*, 991 F.3d 1273, 1279 (D.C. Cir. 2021). But through the Bail Reform Act, Congress identified certain categories of offenses that trigger a rebuttable presumption in favor of pretrial detention, not release. 18 U.S.C. § 3142(e)(2), (e)(3). Where such a presumption is implicated, it imposes a "burden of production on the defendant to

---

[2] On December 29, 2025—the afternoon before the detention hearing—the government asked the Court to accept an indictment against Mr. Cole that had been returned by a D.C. Superior Court grand jury earlier that day. The indictment charges Mr. Cole with the same two counts as the complaint (18 U.S.C. §§ 844(d) and 844(i)). For reasons explained on the record and in a separate order (Min. Order, Dec. 30, 2025), the Court deferred a decision on whether to accept that indictment and requested briefing on the issue.

5

offer some credible evidence contrary to the statutory presumption[.]" *United States v. Boykins*, 316 F. Supp. 3d 434, 436 (D.D.C. 2018) (emphasis added) (citing *United States v. Taylor*, 289 F. Supp. 3d 55, 63 (D.D.C. 2018)). "While the burden of production may not be heavy," *United States v. Lee*, 195 F. Supp. 3d 120, 125 (D.D.C. 2016), it requires that the defendant proffer "some credible evidence contrary to the statutory presumption," *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985). "If the defendant meets his burden of production, the presumption does not disappear entirely but remains a factor to be considered among those weighed by the district court." *United States v. Thomas*, 456 F. Supp. 3d 69, 71 (D.D.C. 2020); *United States v. Gamble*, 810 F. App'x 7, 8 (D.C. Cir. 2020) ("[T]he statutory presumption does not disappear like a 'bursting bubble' once a defendant offers some evidence that he is not a danger to the community[.]"). In any case, the presumption "does not shift the burden of persuasion, which remains with the government." *Boykins*, 316 F. Supp. 3d at 436 (emphasis added). This means the government retains the ultimate burden to establish some basis for pretrial detention, either by demonstrating that the defendant poses an unmitigable risk of flight by a preponderance of the evidence, *United States v. Vasquez-Benitez*, 919 F.3d 546, 551 (D.C. Cir. 2019), or an unmitigable risk of danger to the community by clear and convincing evidence, *Munchel*, 991 F.3d at 1279.

Applying these principles here, the Court concludes that this case implicates a rebuttable presumption of detention. And even assuming Mr. Cole rebutted that presumption, the government has shown by clear and convincing evidence that there are no conditions of release that can reasonably assure the safety of the community.[3]

---

[3] During the hearing, the government confirmed that it does not presently seek Mr. Cole's detention under a risk-of-flight theory, so the Court's discussion focuses on a dangerousness analysis.

I.  **Rebuttable Presumption of Detention**

The Bail Reform Act triggers a rebuttable presumption "that no condition or combination of conditions will reasonably assure ... the safety of the community if ... there is probable cause to believe that the person committed" one of a list of crimes enumerated by statute, including a violation of 18 U.S.C. § 844(i). *See* 18 U.S.C. § 3142(e)(3)(C); 18 U.S.C. § 2332b(g)(5)(B). On this basis, the government says a rebuttable presumption of detention applies here. The defense says otherwise, insisting the government has not established probable cause to believe that Mr. Cole committed an offense under Section 844(i). The Court agrees with the government.

As an initial matter, the defense argued in its brief that the only way the government can show probable cause for these purposes is through an indictment returned by the grand jury. (*See* ECF No. 23 at 6 ("Where there is no indictment, like here, no pretrial detention hearing can begin with such a presumption.").) That is wrong. The two cases cited by the defense did not hold that a grand jury indictment was the only path to a finding of probable cause in this context. Instead, they considered and rejected a theory that some "independent finding of probable cause," above and beyond a grand jury indictment, was necessary. *United States v. Williams*, 903 F.2d 844 (D.C. Cir. 1990) (per curiam) (unpublished); *United States v. Contreras*, 776 F.2d 51, 55 (2d Cir. 1985) (similar). In other words, the defense's cases stand for the proposition that a grand jury indictment is *sufficient*, but not *necessary*, to establish probable cause for purposes of triggering a rebuttable presumption of detention under Section 3142(e). And longstanding caselaw in this District is consistent with that understanding. Apart from an indictment, "the facts found by the judicial officer at the detention hearing [can] determine whether the statutory presumption is implicated[.]" *United States v. Bess*, 678 F. Supp. 929 (D.D.C. 1988); *see also, e.g.*, *United States v. Johnston*, 2017 WL 4326390, at *3 n.2 (D.D.C. Sept. 28, 2017) (reasoning that "the government's proffer"

7

in the detention-hearing proceedings "provide[d] the requisite probable cause" to trigger the "rebuttable presumption of detention," despite the absence of an indictment).[4] During the hearing in this case, defense counsel retreated from this sweeping theory, pivoting to argue that an indictment is the preferred method for showing probable cause, even if not required.

In any case, the facts proffered to the Court in connection with the detention hearing, including the government's description of Mr. Cole's own reported statements to law enforcement during his post-arrest interview, provide an ample basis to conclude, at least for present purposes, that there is probable cause to believe Mr. Cole violated 18 U.S.C. § 844(i)—*i.e.*, that he maliciously attempted to damage or destroy, by means of fire and explosive materials, real or personal property affecting interstate commerce (namely, the DNC and RNC headquarters). So the Court concludes that a rebuttable presumption of detention applies.[5]

From there, the defense points to several considerations that it says should serve to rebut any presumption. Mr. Cole has no criminal history, for instance, and he is a high-school graduate who has held steady employment in the area since his teenage years. More, Mr. Cole has considerable family and community support. The Court assumes these points meet the modest burden of production to rebut the statutory presumption. *See, e.g.*, *United States v. Hunt*, 240 F. Supp. 3d 128, 133 (D.D.C. 2017) (assuming same based on somewhat similar facts).

---

[4] In fact, there is at least some authority in this District for the proposition that a judge can find probable cause that a defendant committed a presumption-triggering offense that is uncharged altogether, whether by complaint or indictment. *See, e.g.*, *United States v. Lee*, 206 F. Supp. 3d 106, 110–11 (D.D.C. 2016). The Court need not go that far here because the government has at least charged Mr. Cole by complaint with violating 18 U.S.C. § 844(i). But the Court raises the point to further demonstrate the fallacy of an indictment-only theory as applied to the Bail Reform Act's rebuttable-presumption framework.

[5] Finally, the Court is mindful that a Superior Court grand jury *did* return an indictment on the 844(i) charge against Mr. Cole. The Court has not yet accepted that indictment for reasons explained elsewhere, so it does not rely on the indictment for present purposes. But even still, the Court notes that the indictment is consistent with the Court's independent probable cause determination at this juncture.

But as noted, that does not mean the presumption disappears entirely. Instead, it remains "a factor to be considered among those weighed" in the normal course under Section 3142(g). *United States v. Klein*, 539 F. Supp. 3d 145, 152 (D.D.C. 2021). This is so because the presumption is "not simply an evidentiary tool designed for the courts" but serves as a reflection of "Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial[.]" *United States v. Lee*, 195 F. Supp. 3d 120, 125 (D.D.C. 2016) (quoting *United States v. Stone*, 608 F.3d 939, 945–46 (6th Cir. 2010)); *see also United States v. Ali*, 793 F. Supp. 2d 386, 391 (D.D.C. 2011) (explaining that, even when rebutted, the "presumption is incorporated into the other factors considered by this Court in determining whether to grant a conditional release and is given substantial weight"); *United States v. Cherry*, 221 F. Supp. 3d 26, 32 (D.D.C. 2016) (same).

The Court therefore proceeds to analyze the relevant factors set forth in Section 3142(g) to determine whether pretrial detention is warranted here.

**II.    Section 3142(g) Factors**

In evaluating "whether there are conditions of release that will reasonably assure … the safety of any other person and the community," the Court must consider: (1) "the nature and circumstances of the offense[s] charged"; (2) "the weight of the evidence against the person"; (3) "the history and characteristics of the person"; and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

**A.    Nature and Circumstances of the Offenses**

Start with the nature and circumstances of the charged offenses. As the government fairly describes this case, Mr. Cole "is charged with transporting two explosive devices into Washington, D.C. and planting them at the headquarters of the two major political parties of the United States." (ECF No. 17 at 18.) The charged offenses are undeniably serious as a general matter. To simply

describe them is to demonstrate as much. More, the U.S. Code prescribes significant penalties for these specific criminal offenses. If convicted, Mr. Cole faces up to ten years of imprisonment on the first charge under Section 844(d) and up to twenty years of imprisonment on the second charge under Section 844(i), with a five-year mandatory minimum. 18 U.S.C. §§ 844(d), 844(i). These lengthy periods of potential imprisonment reflect Congress's views about the seriousness of the charges. *See, e.g.*, *United States v. Brown*, 538 F. Supp. 3d 154, 167 (D.D.C. 2021) ("These substantial terms of imprisonment reflect Congress' appreciation for the severity of these offenses."); *United States v. Wills*, 311 F. Supp. 3d 144, 148 (D.D.C. 2018) (finding that a five-year mandatory minimum "reflect[ed] Congress' judgment as to the seriousness of the offense"). Further, the statute specifically directs the Court to consider "whether the offense … involves a … firearm, explosive, or destructive device," 18 U.S.C. § 3142(g)(1), as is true here.

  Further, the specific circumstances by which the offenses are alleged to have been carried out—including the timing and broader context—further amplify their severity. After all, Mr. Cole is charged with placing the two IEDs in the immediate vicinity of the U.S. Capitol the night before U.S. lawmakers were set to gather to certify the results of the 2020 election. Although Mr. Cole, during his post-arrest interview, apparently disclaimed any intent to interfere with that process, the resulting fear and alarm followed all the same—and how could it not? Even still, the defense strives to minimize the offenses because the IEDs never detonated, such that nobody was injured and no property was damaged. The Court finds that point decidedly unpersuasive. As the government appropriately observes (*see* ECF No. 17 at 20), "it was luck, not lack of effort," that caused the devices not to detonate. *See also Klein*, 539 F. Supp. 3d at 153 (rejecting similar claim that the defendant's actions did not precipitate "specific acts of violence or the death or injury of any person," as "more a product of fortune than fate"). After all, Mr. Cole reportedly stated that he

10

planted the devices—one of them underneath a public bench, no less—hoping they would detonate and that there would be news about it. Mercifully, that did not happen. But if the plan had succeeded, the results could have been devasting: creating a greater sense of terror on the eve of a high-security Congressional proceeding, causing serious property damage in the heart of Washington, D.C., grievously injuring DNC or RNC staff and other innocent bystanders, or worse.

Simply put, the nature and circumstances of the charged offenses here are gravely serious, so this factor points strongly toward pretrial detention.

### B. Weight of the Evidence

Next up, the weight of the evidence. This factor puts the Court in the somewhat awkward position of assessing the evidence before trial, but the statute requires its consideration. For all the reasons laid out in the government's detention memorandum, the weight of the evidence against Mr. Cole is significant. Among other things, the government's proffer places Mr. Cole's vehicle in the general vicinity of the DNC and RNC headquarters during the timeframe at issue, shows that Mr. Cole's cell phone interacted with five different cell towers in the relevant locations during the key timeframe, and catalogues in detail how Mr. Cole's credit card and financial records reflect his purchase of many distinctive component parts found in those explosive devices. And that is all before the Court even gets to the statements Mr. Cole made to law enforcement during his post-arrest interview with the FBI—reportedly admitting that he was responsible for the explosive devices, describing how he built and transported them, and more. All in all, the government's proffered evidence is compelling, so this factor likewise points toward detention.

In response, the defense principally argues that the government is approaching this factor through the wrong lens: that courts should not assess the weight of the evidence "in terms of the defendant's guilt," but rather only as to "the defendant's *dangerousness*." (ECF No. 23 at 9.) In

11

support, the defense cites *United States v. Hunt*, 240 F. Supp. 3d 128. But *Hunt* did not endorse that view. Instead, *Hunt* evaluated the weight of the evidence against the defendant on the underlying charges (*i.e.*, evidence of guilt), before observing that "[c]ourts in other circuits consider only the weight of the evidence of the defendant's dangerousness," and finding even that alternative perspective tilted in favor of detention on the facts there. *Id.* at 134. Courts in this District recognize that the weight-of-the-evidence factor necessarily encompasses consideration of the defendant's guilt for the charged offense(s). *United States v. Taylor*, 289 F. Supp. 3d 55, 66 (D.D.C. 2018); *United States v. Ausby*, 2019 WL 2452988, at *4 n.3 (D.D.C. June 11, 2019). The defense's narrower view is misplaced.

### C. Individual History and Characteristics

Turn then to Mr. Cole's history and characteristics. This factor requires the Court to assess, among other considerations, "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings[.]" 18 U.S.C. § 3142(g)(3)(A). The defense rightly highlights several points that tilt in Mr. Cole's favor here. For one thing, Mr. Cole has no prior criminal history, let alone any history of failing to comply with court orders or conditions of probation or supervised release. He has longstanding ties to the community and a network of family support. Mr. Cole graduated high school and has remained steadily employed in his family's business for many years. Finally, the defense reports that Mr. Cole is diagnosed with autism spectrum disorder and obsessive-compulsive disorder. These facts, the Court agrees, typically point against the need for pretrial detention and instead suggest that conditions of release could reasonably mitigate any prospective risk of danger that Mr. Cole might pose.

The government acknowledges, at least implicitly, that this factor—at least more than the others—favors Mr. Cole. But it urges the Court to pay close attention to Mr. Cole's conduct after the date of the underlying offense. Specifically, the government highlights that Mr. Cole reportedly continued to purchase some of the same component parts used in the IEDs across more than a dozen different transactions during 2021 and up through August 2022. (*See* ECF No. 17 at 11.) Relatedly, the government points to Mr. Cole's reported statement that he again created—or at least attempted to create—a black powder substance, albeit ostensibly for a science experiment. Further, the government stresses that Mr. Cole reportedly wiped his phone "nearly one thousand times" during the "years-long national investigation into his actions," which the government paints as an effort to obfuscate his actions and evade responsibility. These points, certainly taken together, do cut against the other facets of Mr. Cole's history and characteristics highlighted by the defense and summarized above. In the Court's view, however, they are more appropriately considered in connection with the fourth factor under Section 3142(g), which the Court discusses next. As to this third factor, though, the Court believes that it points on balance more toward release than detention.

### D.    Nature and Seriousness of the Danger Posed by Release

That leaves the final factor: "the nature and seriousness of the danger to any person or the community that would be posed by [Mr. Cole's] release." 18 U.S.C. § 3142(g)(4).

Start with the law. The D.C. Circuit has made clear that "to order a defendant preventatively detained, a court must identify an articulable threat posed by the defendant to an individual or the community." *Munchel*, 991 F.3d at 1283; *see also id.* at 1285 (Katsas, J., concurring) (describing the analysis as a "forward-looking assessment"). In other words, the inquiry is fundamentally a prospective one—focused on the risk of future danger—though a defendant's prior conduct can

inform that prospective assessment. *See id.* at 1283 ("Whether the defendant poses a threat of dealing drugs, for instance, may depend on the defendant's past experience dealing[.]").

In terms of Mr. Cole's past conduct, his alleged construction and placement of explosive devices intended to detonate outside the DNC and RNC headquarters, on the eve of the January 6 electoral college certification at the nearby U.S. Capitol, demonstrates a startling and significant capacity for dangerousness. In this way, the government's focus on the conduct giving rise to the charges is important to the Court's assessment. But the Court cannot make a dangerousness determination based on past conduct alone—it simply informs the Court's prospective view.

In looking ahead, the defense urges the Court to focus on the fact that the underlying offense conduct here occurred nearly five years ago (almost to the day), without any claim or proffered evidence from the government that Mr. Cole engaged in any similar conduct—or seemingly any dangerous or violent conduct at all—over the past several years. The Court finds that argument reasonably persuasive, at least as far as it goes. And if there were truly no proffered evidence about comparable or otherwise dangerous conduct across the past five years, the Court might consider this a more suitable case for release on strict conditions.

But there is more. Because as the government's proffer shows, after January 5, 2021, Mr. Cole reportedly purchased many of the same parts used in the explosive devices—including metal pipes, end caps, wire, steel wool, a timer, and more. (ECF No. 17 at 11 (chart).) These purchases spanned at least a dozen different transactions between January 21, 2021, and August 13, 2022. This evidence undercuts the suggestion that Mr. Cole's alleged conduct was some anomalous event that occurred only once many years ago. Instead, for at least the better part of two years afterward, Mr. Cole reportedly engaged in the same activity leading up to the offense conduct, amassing the same sorts of parts he used to construct the two explosive devices giving rise to these charges.

14

More, and relatedly, Mr. Cole apparently told the FBI that at some point after January 5, 2021, he again created (or attempted to create) another batch of powder, although he claimed it was unrelated to bombmaking. This ongoing alleged activity—which is at least consistent with continued "bombmaking" activity, as described by the government—tempers the notion that the five-year span between the underlying offense conduct and today mitigates any future risk.

Even still, the Court considered that Mr. Cole's additional purchases of component parts is only shown to have taken place through August 2022, ending nearly two and a half years ago now. That itself is a material passage of time. So again, if there were no evidence about other concerning conduct between August 2022 and today, the Court might take a different view.

But there is still more. Because when law enforcement arrested Mr. Cole in early December 2025 and executed search warrants, the government recovered many of the same component parts just described in his possession, some in Mr. Cole's residence and others in his vehicle. Although several were found alongside receipts dating back years (seemingly to some of the earlier 2021 and 2022 purchases listed in the government's brief), the fact remains that Mr. Cole was still in possession of those materials as recently as last month. And importantly, these items were not in some offsite storage unit or distant stash house. They were recovered in a closet in Mr. Cole's home and inside his car—two locations essentially within arm's reach of Mr. Cole's daily routine. His ongoing retention of and access to the same components used to construct the explosive devices recovered outside the DNC and RNC headquarters in January 2021 raise substantial red flags in the Court's mind about a prospective risk to public and community safety.

Both points just discussed—Mr. Cole's continuing purchases of parts to construct the explosive devices, and his continuing possession of parts as recently as last month—are especially troubling to the Court considering that he reportedly told law enforcement that he was "relieved"

15

that the devices did not detonate on January 5, 2021. If true, then that fortunate outcome should have been a stark wake-up call for Mr. Cole. But based on the information presented to the Court, it was not. To the contrary, that very same month—in late January 2021—Mr. Cole reportedly purchased more of the same kinds of parts he allegedly used to construct the explosive devices recovered outside the DNC and RNC buildings, including a metal pipe, steel wool, alligator clips, and a timer. And he seemingly remained in possession of those types of items throughout the last five years, until as recently as last month, including in his home and in his car.

Of course, the Court evaluates those concerns alongside conditions of release it could fashion to mitigate them. And the defense, to its credit, is not simply asking the Court to release Mr. Cole on his personal recognizance. The defense is proposing that Mr. Cole be released pursuant to a set of strict conditions, including home detention, GPS monitoring, the appointment of a third-party custodian, and more. But the Court can—and should—appropriately consider "whether it believes the defendant will actually abide by its conditions." *Munchel*, 991 F.3d at 1280–81. And based on the record before it, the Court has concrete concerns on that front.

For one thing, as the government characterizes Mr. Cole's post-arrest interview, he reportedly told the FBI that he carried out the underlying offenses here because "something just snapped." (ECF No. 17 at 16.) The sudden and abrupt motivation behind Mr. Cole's alleged actions presents concerns about how quickly the same abrupt and impulsive conduct might recur. More, Mr. Cole reportedly told the FBI that he assembled the IEDs "in the hours before he drove to Washington, D.C. on January 5, 2021" (*id.* at 15), suggesting he can prepare dangerous explosive devices in short order, over a matter of hours, not necessarily days or weeks. Given the precipitousness with which Mr. Cole reportedly acted, and the speed with which he was able to construct the so-called "pipe bombs," the Court lacks confidence that even the most rigorous set

16

of release conditions can reasonably guard against the risk of future danger. More, the Court shares the government's concerns about Mr. Cole's efforts to hide and obfuscate his activities—efforts that would hamper the ability of even the most well-intentioned custodian to effectively monitor him. For instance, beginning in 2022, Mr. Cole reportedly carried out repeated "wipes" or "factory resets" of his cellular device, occurring at least once per week and sometimes multiple times per day. The defense has proffered that Mr. Cole suffers from obsessive-compulsive disorder, and the Court recognizes that this behavior could stem from symptoms related to that condition. But Mr. Cole's alleged behavior is at least equally suggestive of efforts to conceal and destroy information about his personal communications and online activity. That is troubling and portends real challenges in monitoring his conduct in a home-detention setting.

Although home incarceration and a GPS monitor would provide some check against Mr. Cole's ability to carry out any menacing or dangerous conduct in the community, the Court is simply not satisfied these conditions rise to the necessary level for the reasons explained. This is particularly true based on the severity of the potential danger Mr. Cole is alleged to pose, given his alleged persistent acquisition and retention of so-called "bombmaking parts," and given his reported penchant and capacity to create explosive devices and deploy them in public settings.

On this last point, the defense argues, in reliance on *Munchel*, that "[t]he circumstances giving rise to the charged offense in this case are incredibly unlikely to manifest themselves again." (ECF No. 23 at 14.) Presumably this refers to the fact that Mr. Cole is charged with planting the explosive devices amid Congress's electoral certification on January 6. The Court agrees it must "consider[] the specific circumstances that made [the offense conduct] possible," *Munchel*, 991 F.3d at 1284, but it disagrees that this factor helps Mr. Cole here. To start, *Munchel* made this point in connection with the "unique opportunity" afforded those defendants "to obstruct democracy on

January 6," largely because the presence of the large crowd gathered at the Capitol "was critical to their ability to obstruct the vote and cause danger to the community." *Id.* (emphasizing that those defendants "did not vandalize any property or commit violence"). Based on the charges here, Mr. Cole is very differently situated. His alleged actions were not facilitated by the presence of a large crowd gathered for some distinct purpose, as in *Munchel*. Instead, Mr. Cole is accused of acting alone on the streets of Washington, D.C., choosing targets accessible to the general public at any time, day or night. (Plus, Mr. Cole reportedly disclaimed to law enforcement that his actions were directed at Congress or related to the Congressional proceedings on January 6). Unlike *Munchel*, then, the Court sees no basis to conclude that the underlying circumstances here were materially "unique" for purposes of its prospective dangerousness analysis.

\*   \*   \*

Finally, the Court ends this analysis where it began: returning to the presumption of detention that applies here. Because even assuming Mr. Cole came forward with sufficient evidence to rebut that presumption, Congress's substantive judgment in favor of preventive detention in this case remains a factor in the Court's analysis, and one that should receive "substantial weight." *Ali*, 793 F. Supp. 2d at 391. That factor, along with the other considerations discussed above, leads to a conclusion that there are no conditions of release the Court can fashion to reasonably assure the safety of others and the community in this case.

## CONCLUSION

The Court is keenly aware that pretrial detention must be "the carefully limited exception," *Salerno*, 481 U.S. at 755, due in no small part to the fact that Mr. Cole, like all defendants, is entitled to a presumption of innocence at this juncture. And the Court understands its "grave constitutional obligation to ensure that the facts and circumstances of each case warrant this exceptional treatment." *Munchel*, 991 F.3d at 1285. But based on the Court's careful consideration of the relevant factors that govern its determination, this case fits that bill.

Accordingly, the Court **GRANTS** the government's motion for pretrial detention and orders that Mr. Cole shall remain detained pending trial.

Dated: January 2, 2026

                                                            MATTHEW J. SHARBAUGH
                                                            United States Magistrate Judge